May it please the Court, Jennifer Sheets on behalf of Petitioner and Appellant Jerry Michael Smith. I'll first briefly address what the Court has asked for specifically in the exhaustion doctrine. The exhaustion issue was not briefed in this case. In particular, it's because the State waived exhaustion under Rule 5b of the Rules Governing Section 2254 cases. The answer to the habeas petition must state whether any claim in the petition is barred by failure to exhaust State remedies. Here the State did not raise any exhaustion as a defense in the answer. So there is no reference to exhaustion by the State in the answer or by the district court. And next I'll move to the purpose of the exhaustion requirement, which is to give the State the opportunity to pass upon and correct alleged violations of its prisoners' Federal rights. To this, the State must be given an opportunity to understand the prisoners' claims, and the issues must be fairly presented to the Court. And I would argue that here Mr. Smith's claim that his confession was involuntary and coerced and in violation of his rights under Miranda was presented to the State courts in the trial court through the Supreme Court, though the issue of Siebert, which is the two-step interrogation process, was not decided at the time of his trial in 2003, but was decided before the finality of his appeal. You know, I noticed in your brief you attempted to characterize this case as similar to Missouri v. Siebert. But it seems to me in Siebert the defendant gave a confession before ever being Mirandized. The police then read him his rights and had him repeat his confession. That case is far different from the facts in this case, is it not? Well, I guess I would disagree to the extent that both of them are. Tell me why you disagree. Well, because I think if you read the transcript that the police officers are clearly, at least they are under the impression that he hasn't been Mirandized when they keep over and over again trying to convince him that he's not under arrest and that he doesn't need counsel. And it's pretty clear that, you know, I think there's about 20 or 30 pages where they keep telling him, you know, we're not holding you here. You may be free to go, but don't go, I mean, essentially is what they keep telling him over and over again. And I can't see any other reason for them to be telling him that than they don't think that he has been Mirandized. And then in terms of, you know, it has, you know, I did address it in the briefing, but the DOJ was the body which gave him the lie detector test prior to the sheriff's office coming in and interrogating him. And so there's an issue of whether or not he was Mirandized then, I guess, and whether or not that is good for the subsequent interrogation by the sheriff's office. I don't think the sheriff's office thought it was. Otherwise, I don't think they would have proceeded with the interrogation the way they did. And then in terms of the subsequent Mirandas, the – I guess it is troubling that the Miranda is not on the record, the subsequent Miranda is not on the record, but the – in terms of when they turn the tape recorder off, he's left in the room. They turn the tape recorder off. He then, I guess, asks to talk to one of the officers, which we don't know because the tape recorder has been turned off. So we're relying upon the officer's rendition of what happened subsequently. They say that he asked to speak with one of the officers. They say that they Mirandized him. They say that he asked, you know, if he could barter a confession for his leniency for his wife. And they say they called the district attorney's office and negotiated this. Then they do, again, give the Miranda on the record in a taped subsequent interview. So if you go back, the State court, as I understand it says, when it gets to that point, when he says, yeah, I want to check with a lawyer at this point, that's the point the State court views as the invocation of his request for a lawyer. Is that right? Yes, I believe so. So what I'm wondering is in a way sort of a prejudice issue because we have kind of three phases here. We have kind of phase one where he's Mirandized, and then there's this dancing between the officers about, well, you're not going to be arrested, and, you know, don't worry, that kind of thing. And then there's this certainly an equivocal invocation at that point. And then we have the stop. Then we have the phase two you just described, which is we only have testimony about what happened when the tape was turned off. And then we have phase three where the tape goes back on. So my question is, during that phase one, if you want to call it that, did he make any statements there that could be used against him? That could be used against him in phase one? Up to the point where he says, I want to check with a lawyer. Arguably, no. Okay. So then the question I have is, well, what is the effect, do you think, legally, of that back and forth between Mr. Smith and the officers? During that phase one period up to the point where he says no? I mean, as argued in the brief, I would say that that whole back and forth was used as a tactic, which was trained to the police officers to break his will. I mean, he repeatedly asks. I mean, I have a litany of when he asks for them to call an attorney for him. He asks to call an attorney. They say, no, you can't use your phone, officer safety. And I think all of these methods combined with their repeated suggestion that the officers are at his house right now, can't go there, you know, is a sense of urgency. And when he requests counsel and they don't provide counsel and they take away his phone, I think that puts him in a state of vulnerable state where he doesn't believe he has any choice. I mean, and I think that's part of the coercion. And that's why I would say it's related to what happens next. Okay. So, but in terms of exhaustion, I would just say that he did present in his appeal both a coercion argument and all of the facts that would go with that, including that the police officers continued to interrogate him through in violation of Miranda, and then subsequently also said that the Miranda admonition was improperly done and inconsequential. And while in the state appeal and the petition for review, there was no reference precisely to Siebert, I would say all of the facts were discussed in that regard. And most of the argument with regard to how the officers continued to interrogate through the Miranda violation goes towards that tactic. And Siebert really is about a tactic that is used by police to try and coerce defendants into a confession. When you cite Siebert, this goes to Judge McHugh's question, did he say anything incriminating before he was Mirandized? In terms of what the police say, yes, that he brought them back into a room that was not where the tape recorder had been turned off, and at that point, yes. And, I mean, again, if we're saying that the first DOJ admonition is not valid at that point, which I don't believe it is, then he had not been given his Miranda at that point. All right. And so he did then offer to negotiate something with them at that point, as far as they say. So I would say that's incriminating. Thank you. And I'll leave the room. I'm sorry, yes. Thank you. May it please the Court. Deputy Attorney General Barton Bowers on behalf of the Warden. This is not a case of two-step interrogation. It is a case of two-waiver interrogation. Speaking about exhaustion, since the Court inquired about that, that requires a fair presentation of the claim, being the legal theory, along with the operative facts. That's basically what this defendant did. And down below in the district court, the Warden did admit exhaustion, and the magistrate judge, Judge Hollows, found that the claims were exhausted before this case was reassigned to Circuit Judge Tallman, who later denied the petition. And I'll tell you what bothers me about this case. Didn't the State court err in determining that Smith did not unambiguously request an attorney until he, after he was asked to provide a DNA sample? For instance, he talks about records 745. Now do I get to call a lawyer? Oh, you will, you will. And it goes on. And then the record at 755, yeah, I want to check with a lawyer at this point. I mean, he's clearly indicating he wants a lawyer. Why isn't that determinative of the fact that he was denied a lawyer? He's mentioning a lawyer. He eventually had. But the test at that time, they kept questioning him. Well, but the test is whether there's an unequivocal request for a lawyer that would be understood to a reasonable officer. And the State court rightly found that these were equivocal statements, up to a point. At a certain point, he says, I want a lawyer. And they asked him nothing after that point but booking questions. And between those two points, the point you mentioned and the time where he makes the unambiguous, undisputed request, there's nothing incriminating that's there. And it's a very short period of time. We're talking maybe 10, 20 minutes at the most. But the bottom line is there's nothing incriminating that comes out. There's nothing incriminating that comes out until after he has reread his Miranda rights, waives them again, and then gives his confession. Now, counsel says that there was something incriminating that was said that was off tape. There was apparently an offer to discuss the facts of the case. But there was never anything that was said that was incriminating. The most he presented was an offer to tell the police his participation and his wife's participation. But I cited in the brief a case from the Second Circuit saying that an offer to tell the truth is not by itself incriminatory, self-incriminatory. So this case does not remotely resemble the facts of Siebert. And counsel has tried to present this as a two-step interrogation. To show that, they have to show a deliberate strategy that was intended to violate Miranda. We can't possibly have that here because it is undisputed that Mr. Smith was read his Miranda rights before his initial polygraph examination on that same day. And it is undisputed that the police knew that. So it cannot be the case that they deliberately set out to violate his rights when they knew he had already been read his rights. And so this case does not resemble Siebert at all. And the Siebert claim fails, regardless of whether this claim was exhausted or even assuming for the moment that it was unexhausted, because an unexhausted claim may still be denied where it is not colorable. And here we don't have a colorable Siebert claim. I'm happy to answer any of the questions on behalf of the Court. My concern is similar to that of Judge Gelson. It looks like he certainly made requests for an attorney at various times that it's kind of questionable whether they're ambiguous or not. The one I'm thinking of is where he said, I'd like to make a call to my attorney, and the officer said, well, no, we can't do that in here, but I'm going to go out. And he left the impression he was going to call an attorney for him. Now, how do we deal with that? All that took place after that statement on Mr. Smith's part was further discussion, and the bottom line is there was nothing incriminating that was said between that statement and the later re-waiver, re-advisement and re-waiver of rights. There was continued discussion, but there was no willful violation of his rights that could possibly result in a constitutional violation here, because the fact is he was later re-advised his rights, and he chose to waive them, and he said nothing incriminating before that happened, and that's the bottom line in this case. And so the Court of Appeal did not unreasonably apply Supreme Court law when it made those findings. And unless there are any further questions from the Court. I think not. Thank you. Judge Hunt has a question. Just following up on that, so are you conceding that really that wasn't a request from an attorney that he didn't follow? No, no. To us it was not an unambiguous request for counsel. And my answer is even assuming it was, we've cited the case of Garvin v. Farman, which illustrates that even a willful violation of Miranda does not necessarily result in a constitutional violation entitling a petitioner to relief where there was a later re-advisement and a voluntary waiver of those rights. And that's in the brief. Okay. Thank you. Thank you. The warden submits it. Thank you very much. You have some rebuttal time. Okay. Thank you. I just actually want to briefly go through the clerk's transcripts real quick with regard to the request for counsel. At page 729, after his initial question whether or not he should get an attorney, he says, I'll ask again for the last time, should I get a lawyer boss? Here, Appellant noted that the reason he asked was because police kept telling him he was not under arrest, but they weren't permitting him to leave. And then it was 4 p.m., and they said he could leave right after that. Next, Appellant attempted to call an attorney, but when he used his phone, the Sergeant Hill told him that he could not make any calls for officer safety reasons. The Sergeant told him, told Appellant that he had to leave and call the district attorney himself. And Appellant asked him then, I got another question. While you're making the call, is it okay if you could call and so I could get a lawyer? Hill responded, if I can get a lawyer for you? And Appellant says, yeah, right, if you can, because that way you know what, I'm not calling anybody or anything like that, so I can get a lawyer. Your opponent says even admitting, supposing that was a violation, which is very close to me, but even so, the state's counsel says, well, there was nothing that happened that was prevented him saying, evading it afterward. So even assuming there was a violation of the right to counsel, that it was not prejudicial. Well, unless it was coercive, which is what we argued, and that's what led to his ultimate request to negotiate a confession. So, I mean, and also with regard to what was said earlier, if you look back into the clerk's transcript, when Sergeant Hill records the statement after he had the tape turned off, he does talk about how, you know, when he's giving his rendition, how Michael had offered to had him call the district attorney to see if they could work out an exchange of his confession for the promise that his wife would get a 32 PC, which is an accessory after the fact, with no jail time or prison time, which clearly seems to me that that is an offer of a confession, rather than something that would be incrementory. Thank you. Thank you both for the argument. Very interesting case. And the case of Smith v. Kirkland is submitted. We'll take a ten-minute break. But the next case for argument is Macias v. Donut. If you could go ahead and come up and get set up, and we will return in ten minutes. All rise. We will return in ten minutes.
judges: Hug, Nelson D. W., McKeown